T. Barry Kingham (TBK-1219)
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000

*Attorneys for Defendant Douglas Dey*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Cr. No. 10-457 (RRM) |
| - against - | : | |
| CHRISTOPHER FINAZZO and DOUGLAS DEY, | : | |
| | : | |
| Defendants. | | |
| | : | |

--------------------------------------------------------X

### SENTENCING MEMORANDUM
### ON BEHALF OF DEFENDANT DOUGLAS DEY

TABLE OF CONTENTS

Page

Table of Authorities .................................................................................................................. ii

I       A Sentence Of One Year And A Day Is Authorized And Appropriate ................................. 2

        A.      The Guideline Sentence ................................................................................................ 2

        B.      The Section 3553(a) Factors ........................................................................................ 3

                1.      Nature And Circumstances Of The Offense, Section 3553(a)(1) ...................... 3

                2.      History And Characteristics Of The Defendant, Section 3553(a)(1) .................. 4

                3.      Seriousness Of The Offense, Respect For The Law, Just Punishment,
                        Adequate Deterrence, Sections 3553(a)(2)(A) and (B) ...................................... 4

                4.      Protection Of The Public, Section 3553(a)(2)(C) ............................................. 5

                5.      Provide Treatment For The Defendant, Section 3553(a)(2)(D) .......................... 5

II      Douglas Dey ......................................................................................................................... 6

        A.      Personal Background .................................................................................................... 6

        B.      Personal Qualities ........................................................................................................ 7

III     Statement Of The Offense .................................................................................................. 11

        A.      South Bay's Success ................................................................................................... 11

        B.      The Role Of Paul Conefry .......................................................................................... 14

IV      Doug Dey's Cooperation .................................................................................................... 15

V       The PSR .............................................................................................................................. 17

VI      Doug Dey's Future ............................................................................................................. 18

Conclusion ...................................................................................................................................... 19

i

TABLE OF AUTHORITIES

Page

**CASES**

*Gall v. United States,*
    552 U.S. 38 (2007)................................................................................................................. 2

*Perrin v. United States,*
    444 U.S. 37 (1979)................................................................................................................. 5

*United States v. Corsey,*
    723 F.3d 366 (2d Cir. 2013) ............................................................................................. 2, 3

*United States v. Nardello,*
    393 U.S. 286 (1969)............................................................................................................. 5

*United States v. Preacely,*
    628 F. 3d 72 (2d Cir. 2005) ................................................................................................. 2

**OTHER AUTHORITIES**

18 U.S.C. § 3553(a) ............................................................................................................ 2, 3, 5

18 U.S.C. § 371................................................................................................................... 1, 2

New York Penal Law, Section 180.00.................................................................................. 1, 4

Travel Act, 18 U.S.C. § 1952............................................................................................... 1, 5

United States Sentencing Guidelines, § 5G1.1(a).................................................................. 2

## SENTENCING MEMORANDUM
## ON BEHALF OF DEFENDANT DOUGLAS DEY

We respectfully submit this memorandum with regard to the sentencing of Doug
Dey pursuant to his guilty plea on September 27, 2012. It describes Mr. Dey, his conduct, the
context of his offense, and other matters this Court may consider relevant in sentencing. In
particular, we request that the Court consider Mr. Dey's Fact Submission For The Presentence
Report ("Fact Submission"), attached as Exhibit A to this memorandum, which contains detailed
facts important to the determination of an appropriate sentence.

Doug Dey pleaded guilty to one part of Count I of the Second Superseding
Indictment:  conspiracy to violate the Travel Act by engaging in the underlying offense of
commercial bribery in the second degree under Section 180.00 of the New York Penal Law,
itself a misdemeanor. The maximum penalty for the offense to which Mr. Dey pleaded guilty is
imprisonment for a period of five years and fine of $250,000. 18 U.S.C. § 371.

As supported by this memorandum and the accompanying submission of Letters
On Behalf Of Defendant Douglas Dey, as well as the separate Memorandum With Respect To
Restitution ("Restitution Memo"), we request that the Court sentence Mr. Dey to a custodial
sentence of not greater than one year and a day, with the recommendation that it be served in a
minimum security federal prison camp or community correction center and with treatment for
certain medical issues addressed in a separate submission filed under seal. As discussed below,
if the Court believes a custodial sentence is required, this is an appropriate case for a sentence
well below the statutory maximum sentence.

In the plea agreement, Mr. Dey consented to entry of a judgment of forfeiture in
the amount of $7,500,000, and he has already paid an additional $8 million directly to

Aéropostale.[1] The government has agreed to dismiss the remaining counts of the Second Superseding Indictment against Mr. Dey.

## I

### A Sentence Of One Year And A Day
### Is Authorized And Appropriate

The Guideline sentence of incarceration in this case is five years (60 months), the statutory maximum under 18 U.S.C. § 371. Considering the factors mandated by 18 U.S.C. § 3553(a), however, we request that the Court sentence Mr. Dey to a period of no more than 12 months and one day.[2]

### A.   The Guideline Sentence

In sentencing Doug Dey, as in all sentencing proceedings, this Court must first calculate the applicable range of punishment under the Sentencing Guidelines, *Gall v. United States*, 552 U.S. 38, 42 (2007), and then proceed to consider the factors set forth in 18 U.S.C. § 3553(a). *See United States v. Corsey*, 723 F.3d 366, 374 (2d Cir. 2013), citing *United States v. Preacely,* 628 F. 3d 72, 79 (2d Cir. 2005).

Because the statutory maximum term of custody under 18 U.S.C. § 371 for the offense to which Mr. Dey pleaded guilty is five years, the Guideline sentence cannot exceed 60 months. As U.S.S.G. § 5G1.1(a) provides: "Where the statutorily authorized sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence." *See Corsey*, 723 F.3d 375 (same, citing Guideline). Accordingly, in this case, the Guideline Sentence is 60 months. The calculation is as follows.

---

[1]      We address the effect of the $8 million payment in the Restitution Memo and note here that Mr. Dey has complied with the Judgment of Forfeiture to date and will continue to do so.

[2]      We understand that a sentence of one year or less will not result in credit for good conduct time and thus request a sentence of 12 months and one day.

The PSR reflects an initial calculation of a Total Offense Level of 27 (70 to 87 months) at Criminal History Category I. PSR ¶¶ 31-38. The PSR then increases the Criminal History Category to III by virtue of Mr. Dey's convictions in 1991 and 2001 for driving while under the influence of alcohol, the latter of which included a so-called "criminal justice sentence of probation." PSR ¶¶ 42-44. The result is an increase of the Guideline range to 87-108 months. While we agree that the proper calculation is Level 27, we object to the increased Criminal History Category. Alcohol-related driving convictions are serious, to be sure; but they do not rise to the level that should give Mr. Dey a "criminal history" that should increase the Guideline calculation in this case. Accordingly, the appropriate initial Guideline calculation should be Level 27, Criminal History Category I, resulting in a range of 70 to 87 months.

By virtue of U.S.S.G. § 5G1.1(a), however, the Guideline sentence is 60 months.

## B.     The Section 3553(a) Factors

As the Second Circuit noted in *Corsey,* 723 F.3d at 375-76, when U.S.S.G. § 5G1.1(a) reduces a calculated range, the district court may not simply assume the statutory maximum sentence is reasonable. Rather, it "should be treated as a starting point in a deeper analysis" of the Section 3553(a) factors. *Id*. at 376. Consideration of those factors in this case supports a sentence of no more than 12 months and a day if the Court determines custody is necessary.

### 1.     Nature And Circumstances Of The Offense, Section 3553(a)(1)

This Court is well aware of the events underlying Mr. Dey's plea of guilty and the facts contained in the Fact Submission, Exhibit A to this memorandum. In sum, Mr. Dey built a successful business on its merits and shared his profits with Chris Finazzo. The payment of that profit share violated the law, as Mr. Dey has admitted. But he did not corrupt Chris Finazzo or insinuate himself into Mr. Finazzo's relationship with Aéropostale. The two were always

partners, before, during and after Mr. Finazzo's Aéropostale employment.  And Aéropostale reaped huge benefits as a result of Mr. Dey's efforts.

South Bay succeeded due to the replenishment system and the long-term five-year contract for graphic t-shirts, approved and signed by Julian Geiger.  No competing vendor would make the investment in infrastructure and inventory necessary to fulfill Geiger requirements or the replenishment system.  That was how South Bay successfully ensured that it would keep a substantial portion of Aéropostale's graphic t-shirt business.  South Bay out-performed the competition.

### 2.      History And Characteristics Of The Defendant, Section 3553(a)(1)

Mr. Dey's history and personal characteristics are reflected in the PSR and this memorandum.  He has no prior record of criminal behavior with the exception of two convictions for driving under the influence of alcohol, more than 12 and 20 years ago, 10 years apart.  While he has suffered from certain medical problems for many years, Doug Dey has been an exemplary son to his parents and a devoted and supportive father to his two children.  The letters submitted on his behalf attest to Doug Dey's excellent character as a person: parent, brother, businessman, community supporter.  In short, he is a good person who committed a foolish crime.

### 3.      Seriousness Of The Offense, Respect For The Law, Just Punishment, Adequate Deterrence, Sections 3553(a)(2)(A) and (B)

The Legislature of the State of New York has determined that the underlying offense to which Mr. Dey pleaded guilty (and with which the government charged him) is a misdemeanor, regardless of the amount of money involved.  NY Penal Law § 180.00.  As a federal offense, however, commercial bribery in violation of state law is transformed into a felony under the Travel Act solely by virtue of the use of the mail or other facilities of interstate

4

commerce. 18 U.S.C. § 1952. And the Supreme Court has held that it is generic commercial bribery that permits application the Travel Ac, regardless of whether the underlying crime is a misdemeanor under state law. *Perrin v. United States*, 444 U.S. 37, 48 (1979), citing *United States v. Nardello*, 393 U.S. 286, 295 (1969) (inquiry under the Travel Act "is not the manner in which States classify their criminal prohibitions but whether the particular State involved prohibits the [there extortionate] activity charged").

However, the *Perrin* and *Nardello* cases do not address the *seriousness* of the offense; those cases concern only the application of the Travel Act to generic common-law offenses. We submit that, under the circumstances of this case, it is appropriate to view the offense in the context in which it was committed, as the violation of state law that it is. Thus, sentencing Mr. Dey to no more than one year and one day adequately reflects the seriousness of the offense.

Likewise, such a sentence would promote respect for the law and provide just punishment and adequate deterrence by recognizing that commercial bribery is deserving of time of prison as well as serious financial consequences.

### 4. Protection Of The Public, Section 3553(a)(2)(C)

Of the factors set forth in 18 U.S.C. § 3553(a), this one need not detain the Court. There is absolutely no indication that Mr. Dey will commit another crime, and his record in the seven years since the events of this case has been spotless.

### 5. Provide Treatment For The Defendant, Section 3553(a)(2)(D)

As explained in more detail in the submission filed under seal, Mr. Dey will need treatment for certain medical issues on an ongoing basis. Accordingly, we request that the Court recommend that he be assigned to a minimum security camp or community correction center with treatment for those issues.

5

*     *     *

For the reasons set forth above and substantiated in detail below, we respectfully request that, if the Court believes a custodial sentence is appropriate, the Court sentence Mr. Dey to a custodial sentence of no more than 12 months and a day.

## II

## Douglas Dey

### A.    Personal Background

Doug Dey will be 57 years old when he is sentenced. He was raised in modest circumstances with his three younger siblings, Steven, Bruce and Doreen, in Lynbrook, New York. They were not children of privilege. Their father was an electrician, their mother a homemaker. In recent years Mr. Dey's parents were in declining health and his father died suddenly on August 2, 2013 from a heart attack at the age of 83. His mother, who suffers from dementia at age 84, continues to live in her home. Doug Dey is her principal family caregiver.

Mr. Dey graduated from Malverne High School in 1974 with an average just below 75. He then attended Nassau Community College for two years to pursue a music degree but did not graduate. After two years studying at the Manhattan School of Music, Mr. Dey dropped out and joined a jazz band, for which he played piano. The band played venues throughout the United States and at military bases abroad as part of the USO.

After his stint as a professional musician ended in about 1984, Mr. Dey became a bartender. While working at a bar and restaurant in the garment center in Manhattan, he met Jane Maguire, who was working as a waitress. They married in 1987 and have two children: Alyson, now a senior at Quinnipiac University and Alexander ("Alex"), a recent graduate of

Pace University now working in the fashion industry.  The Deys divorced in July 2012,

following a three-year separation.

In the mid-1980s, while continuing to tend bar, Doug Dey began to work

producing graphic t-shirts for such clients as Macy's and the U.S. Open Tennis tournament.  His

history in that business, as well as his involvement in the events that led to his guilty plea, are

contained in the Fact Submission (Exhibit A).[3]

## B.    Personal Qualities

Throughout his adult life, Doug Dey has been a good father, spouse and son.  His

former wife described him in an interview with the Probation Officer as follows:

> Ms. Dey described the defendant as 'outgoing, well-liked and
> up-beat.'  She noted that he is 'very supportive of other people and
> the community . . . a giver and a family person.'  She also noted
> that the defendant shares a very close and loving relationship with
> his children – every softball game, concert and school event.'

PSR, ¶ 51.

As the letters submitted on his behalf reflect, Doug Dey has devoted himself to

his children, his parents, his community and his employees.  We request that the Court read the

letters, from which, we submit, the following themes will emerge.

### *From Family:*

Doug Dey's former spouse Jane Maguire, his two children Alyson and Alex, his

two brothers Bruce and Steven, his sister Doreen and his cousin Karen Corr, all describe him as

loving, caring and attentive and emphasize that he has been the principal family caregiver for his

elderly and inform parents.  Ms. Maguire writes:

---

[3]     This document was submitted to the Probation Officer in January 2013 for inclusion in the Pre-Sentence
Report ("PSR").  It was thus prepared prior to the trial of Christopher Finazzo.  The Probation Officer did not
include the Fact Submission in the PSR.  Instead, he submitted it to the Court separately.  At sentencing we will
request that the Court direct the Probation Officer to attach it to the PSR so that it will be part of Mr. Dey's record.

> Doug is a good an honest man. This situation has humbled him
> and he feels terrible about the people that were hurt. He is
> ashamed about what [] effect this has had on his children and
> family. He has just had to bury his father, a man that was Doug's
> hero. And his mother is suffering from dementia. He takes her to
> doctors' appointments and food shopping. He is doing all he can
> for her. I don't know what will happen if Doug is incarcerated for
> any length of time.

### *From Business Associates:*

Former South Bay employees Ryan Finter (Calverton), Edward Newman (Peru

manager), Margie Abrams (Calverton designer) and Kimberly Coogan (Calverton) relate how

Mr. Dey treated his employees with respect, care and concern and improved their working and

living conditions. Mr. Finter, who had worked at South Bay since 2001, writes:

> I can remember when Aeropostale had terminated Mr. Finazzo and
> the future of South Bay Apparel as a vendor was in jeopardy.
> Aeropostale had been holding back payments that were past due,
> and we had not received a payment for over 5 weeks. It was right
> before Thanksgiving and this continued through the holiday
> season. All the time Doug never missed a payroll, a payment to a
> subcontractor, or a transfer to our Peru facility for payroll and
> liabilities. Doug continued to personally bankroll the entire
> company, eventually selling his apartment in Peru in an effort to
> fund and employ over 75 employees in New York, and over 150
> employees in Peru. Doug also continued his tradition of giving
> every employee a fresh turkey for Thanksgiving. It was during this
> time that I admired Doug's obligation to his business entities. He
> could have easily closed the doors and terminated over 200
> employees, but he stuck with it, determined to get through what
> was a devastating blow to the company.

Mr. Newman, who managed South Bay Peru, notes:

> Doug's instructions in building the factory were to build to
> American standards, not Peruvian. He had us install hot water in
> the bathrooms and showers, something most of the workers did not
> have at home. Doug also wanted to be able to provide hot lunches
> for the staff so he had me build a cafeteria to service the whole
> staff which was offered at no charge to them. The factory became
> a source of pride for all that worked there.

### *From The Community:*

Doug Dey has been a valued member of the Suffolk County community who

"gave back" in significant ways to the county and the town of Riverhead, where his business was

located. Thus, Bill Birkmier and Mark Miller, local businessmen and Joseph Sawicki, Jr., the

County Comptroller, all relate their experience with Doug Dey's contributions, both financial

and material. One of the most significant of these contributions was a free summer camp

Mr. Dey established at the Sportsplex facility on South Bay's premises in Calverton.

Mr. Birkmier, who set up the camp, writes:

> . . . Doug directed me to get in touch with the town of Riverhead to
> create a summer camp for the less privileged kids of the
> community. The summer camp was a free, all day camp that was
> open to all Riverhead residents and fully sponsored by Doug. The
> camp ran for four weeks, from 9:00am to 3:00pm, and included a
> hot lunch, drinks and snacks for all 120 kids. We organized sports
> such as soccer, baseball, lacrosse, basketball and kickball, all with
> qualified coaches for the kids. In addition, all of the staff was on
> payroll, and brand new equipment such as cooking grills and sports
> supplies were purchased. Furthermore, tee shirts that were colored
> coded by age groups were given to all of the kids, and all of the
> necessities that were needed for the camp and staff to run this
> program were purchased. Doug went over-and-beyond giving
> back to the community.

A news article about the free summer camp and a citation from the State Assembly recognizing

Mr. Dey's accomplishment are attached to Mr. Birkmier's letter.

### *From Friends:*

Doug Dey is a loyal and giving friend. In letters from those who have known him

for many years, the Court will see qualities of true friendship. Thus, Frederick Baltusis (friend

of 43 years), Karen Bennett (current close friend), Leslie Bennett (no relation to Karen Bennett,

friend of 30 years), Frederick Finter (friend of 12 years, former Detective Captain and

commander of the Suffolk County District Attorney's Economic/White Collar Crime Section),

Robert Kerning and Michael Nostrand (friends from childhood) all attest to Doug Dey's personal qualities. These letters have one common element: Mr. Dey's caring and giving nature and his devotion to his family.

### From Attorneys:

While this may seem an unusual category of supporters, three lawyers asked to write letters on Mr. Dey's behalf: Margaret Donohoe, Jane Maguire's divorce lawyer; Richard Tannenbaum, Mr. Dey's divorce lawyer; and Robert Miletsky, a lawyer representing Mr. Dey in a construction case. Their letters are consistent, especially in relating Mr. Dey's quality of fairness. After representing Doug's former spouse, Jane Maguire, in their divorce proceeding which involved difficult financial issues, Ms. Donohoe writes:

> I have no reservation in recommending Douglas to the court as an individual who attempted, during difficult and complicated circumstances, to do what was right and fair towards his family. During all meetings and court appearances, he conducted himself respectfully and with personal consideration. As a divorce litigator for nearly fourteen years, I can assure that court that this is not always the case.

Mr. Miletsky's letter contains a good summary of Mr. Dey's character, reflected in his settlement of a claim by a contractor:

> We felt that there had been serious questions about the contractor's performance and that we could have significantly reduced the amounts that were being claimed by the contractor. While Mr. Dey did not want to be taken advantage of, his concern was making sure that the contractor was paid the fair amount due and that all of the subcontractors, suppliers and individuals who performed work on the project were fairly compensated. Ultimately, we were able to settle the case and ensure everyone was justly compensated.
>
> Not all clients think that way. In fact, most are interested solely in the bottom line, no matter the cost to everyone involved. Mr. Dey's interests were with fairness and propriety.

\*     \*     \*

In sum, Doug Dey is not a man whom one would expect to be guilty of a crime. Yet he has so pleaded, honestly admitting to this Court that his financial relationship with Chris Finazzo violated the law and accepting responsibility for his actions.

### III

### Statement Of The Offense

The offense and Mr. Dey's conduct are discussed at length in the Fact Submission, Exhibit A to this memorandum. We will not repeat that submission here. However, we respectfully submit that the points set forth below merit particular emphasis.

### A. South Bay's Success

The essence of the government's case as charged in the indictment and argued to the jury at the Finazzo trial was that Mr. Finazzo sent an inordinate amount of business to South Bay because he was receiving half of its profits.

While it is undoubtedly true, as Mr. Dey told the SEC and U.S. Attorney starting in 2008, that he split South Bay's profits 50/50 with Mr. Finazzo, the record supports a view of his offense that differs from the government's theory: namely, that South Bay provided a unique and valuable service to Aéropostale and earned what it was paid. That fact does not diminish Mr. Dey's admitted guilt. He hoped and expected that Chis Finazzo would help him obtain and keep business. Likewise, we do not ignore the anecdotal testimony at the Finazzo trial to the effect that Mr. Finazzo favored South Bay and that South Bay, over the course of ten years, had some issues with delivery, especially with fleece products from Peru. In context, however, those issues were minor. There were overwhelming reasons for Aéropostale to use South Bay that are not accounted for by Mr. Finazzo's profit split.

Aéropostale, led by Julian Geiger, supported and favored vendors like South Bay

that supported the company from the beginning. As Aéropostale's general counsel Edward

Slezak testified:

> We had a core group of vendors that started with us when we split
> from Macy's. We didn't have a lot of money. We didn't have
> credit and these are all things that I learned through my period of
> time being there. Didn't have money. Didn't have credit. So we
> needed to have a few, we called them core vendors, maybe you're
> using the word original, [t]hat would agree to make product for us
> on extended payment terms. So what was actually happening was
> we would get the product, we would sell it, we would get the
> revenue for that before we had to pay the vendors. So they took a
> chance on us and Mr. Geiger was always very, in your term now,
> loyal, to people who in the beginning, people meaning vendors,
> who took a chance on us and he felt that as we grew, they should
> also grow because they took the risk in the beginning.

Slezak, Tr. 470-471.[4]  South Bay was one of those "core vendors." *Id.*

South Bay earned Julian Geiger's loyalty by providing a unique fast-turnaround

replenishment system that Geiger described as follows:

> Nobody in the world has ever done what we asked Doug to do. To
> have 3-5 million blanks, replenishing by size, by color, by screen,
> have automated equipment. There's nothing that I would ever say
> that we overpaid for anything. Ever.

GX-20A at 18 (Transcript of Finazzo termination interview).

Geiger's candid remarks at that interview in 2006 were consistent with what he

said to Business Week in June 2004:

> We have the ability to replenish more of our merchandise more
> quickly because such a large percent of our business is printed
> graphic Tee-shirts with our logo on it. Our goal is to be able to fill
> in by size, by color, by screen, by store, in 72 hours, which nobody
> else can do. . . . There are 16 vendors we have used since I started
> here. One of these guys, who shall remain nameless, has a printing
> plant in Long Island. At his risk, he stocks 2.5 million blank

---

[4]      References in the form "Tr. __" or "[witness name] Tr. __" are to the transcript of the trial in *United States
v. Finazzo* (the "Finazzo trial").

Tee-shirts at a time and is totally integrated into our systems. He has invested millions of dollars in infrastructure to be able to receive orders, print them, and get them out the door and to stores in 72 hours, except for California. That takes five days because of trucking time. Last year, we sold about 14 million graphic Tee-shirts. We sold 800 in 1996.

Exhibit A, p. 7. And they were consistent with South Bay's being named Aéropostale's "Partner of the Year" in 2004 and receiving its "Award of Excellence" in 2000, attached as Exhibits B and C, respectively.

The relationship between South Bay and Aéropostale was a great success for both companies: Aéropostale made at least $130 million in gross profit from selling the goods it bought from South Bay. Cunningham, Tr. 174-175.

South Bay more than merited its awards. According to Doris Wilshere, former head of both the Men's Division and Women's Division from 2003 to 2006 at Aéropostale, South Bay's t-shirts were superior in quality to those of the other major vendor, Mias, and South Bay's replenishment system was quicker. Wilshere, Tr. 1754-56. South Bay's willingness to hold and store inventory was of great benefit to Aéropostale. *Id.,* Tr. 1757.

Significantly, only about 10% of South Bay's business with Aéropostale was for fleece products. Wilshere, Tr. 1758. Julian Geiger "had the ultimate say" and supported South Bay's fleece business in Peru: "he agreed that investing in South Bay's fleece business in Peru was fine and we could proceed [with orders] because if he didn't agree, we could not have been able to place the orders." *Id.,* Tr. 1766.

In sum, there were very good reasons for Aéropostale to use and support South Bay. Doug Dey's profit split with Chris Finazzo was wrong and, because it was not disclosed or consented to, it was illegal. But Doug Dey does not believe South Bay succeeded because Chris

13

Finazzo received half of its profits. He believes, and knows, that South Bay was successful

because, as Julian Geiger admitted, it performed better than anyone else and its prices were fair.

## B.   The Role Of Paul Conefry

The acts of CPA Paul Conefry provide a basis for understanding Mr. Dey's

actions and give a context for his sentencing. Conefry was a key participant in the arrangement

by which South Bay's profits were shared by Mr. Dey and Chris Finazzo. Yet Conefry was not

charged with any offense. The absence of any consequences to Conefry is, at best, enigmatic.

The Court could well ask whether the treatment of Mr. Conefry, who escaped prosecution

despite his central role in the events and lies to prosecutors, is appropriate in the circumstances.

We do not suggest that this exonerates Mr. Dey in any way, but it does provide context.

Conefry participated in, facilitated and in some respects directed elements of the

partnership between Mr. Dey and Chris Finazzo. He first admitted that participation in an

interview with FBI agents on September 16, 2009. Conefry admitted that he knowingly handled

the accounting for the 50/50 profit split between Mr. Dey and Chris Finazzo, as well as their

joint interest in various corporations and properties. *See* Exhibit D (FBI Form 302 of 9/16/09

interview, p. 3). Conefry also lied to the agents, stating that the payments to Mr. Finazzo had

been for services as a "consultant" to South Bay. *Id.* Significantly, Conefry's admissions came

only *after* Mr. Dey had identified him and his role to the SEC in August 2008 and to the U.S.

Attorney and FBI in interviews in July and August 2009. *See* Exhibit E (FBI Forms 302 as to

Mr. Dey).

At the Finazzo trial, Conefry admitted that he had lied: the payments were not

consulting fees and he had falsely classified them as such for years on South Bay's tax returns.

Conefry, Tr. 875-76. In exchange for his testimony at the trial, Conefry the CPA was not

prosecuted for preparing and filing false tax returns. Significantly, however, that deal was not

14

reached until April 8, 2013, a week before Conefry's testimony and nearly three years after he was not indicted, despite the clear evidence of his role in the conspiracy and repeated inculpatory interviews with the FBI and U.S. Attorney without counsel and without any "deal." *Id.,* Tr. 877.

Conefry's role was much more than simply keeping the books and filing tax returns. He admitted at trial that he had done the calculations to split the net income of South Bay, had discussed the legality of the Dey-Finazzo partnership with them and repeatedly had told them it was not a problem because there was "no harm, no foul." Conefry, Tr. 884. By that, Conefry meant that Aéropostale was not hurt by the relationship. *Id.,* Tr. 903-04. Having now had an epiphany, Conefry testified: ". . . I told them no harm because I was a fool then, that's why. . . . And they were fools if they listened to me . . . ." Tr. 899. Unfortunately, Doug Dey and Chris Finazzo did listen to Conefry, the professional CPA who should have known better. But, as Conefry testified, his pay from South Bay was too good. *Id.,* Tr. 876. So he breached his obligations to his clients and his profession and helped the Finazzo-Dey partnership thrive.

Doug Dey's actions thus must be viewed in the context of the "advice" he was receiving from Conefry, however foolishly given and received. Conefry was, by any definition, an aider and abettor, a co-conspirator. Doug Dey identified him as such to the authorities as early as 2008. Yet he was not indicted and will suffer no penalty.

# IV

## Doug Dey's Cooperation

Doug Dey has cooperated fully with the investigations conducted by the SEC and U.S. Attorney's Office. Responding to a subpoena addressed to South Bay in July 2008, he produced all relevant documents to the SEC. As the Court knows, those documents formed part of the nucleus of information used by the government in this case. On August 20, 2008, Mr. Dey

was interviewed by attorneys from the SEC's Enforcement Division and gave a full and truthful

description of his actions. The SEC attorneys apparently did not take notes or make a report of

that interview, as none was produced in the criminal case. The SEC took no action against Mr.

Dey or Mr. Finazzo.

 FBI agents contacted Doug Dey on July 17, 2009. He referred them to counsel,

who contacted the FBI and Assistant U.S. Attorney William Schaeffer, who was then in charge

of the investigation. Pursuant to proffer agreements, Mr. Dey was interviewed by Assistant U.S.

Attorneys Schaeffer and Paes and FBI agents, on July 29, August 12 and October 7, 2009.

Copies of the FBI Forms 302 reflecting those interviews are attached as Exhibit E. On reading

the reports, the Court will see that Mr. Dey consistently related the same facts (which we

represent are identical to his unrecorded statements to the SEC). The Court will also notice that

those facts are consistent with the Fact Submission (Exhibit A) and Mr. Dey's plea allocution.

 Not surprisingly, we urged the U.S. Attorney's Office not to indict Mr. Dey.

They disagreed, and he was indicted with Chris Finazzo on June 10, 2010. Following motion

practice addressed to the indictment and discovery, the U.S. Attorney twice superseded and

changed the conspiracy charge.

 Mr. Dey pleaded guilty to a portion of Count I of the Second Superseding

Indictment, conspiracy to violate the Travel Act, on September 27, 2012. In his allocution, he

stated:

> From 1996 to 2006, I knowingly had an arrangement with
> Mr. Finazzo to share profits of South Bay with Mr. Finazzo on a
> 50/50 basis. While Mr. Finazzo was not responsible for all of the
> business I received from Aeropostale, I understood and intended
> that sharing the profits of South Bay with Mr. Finazzo would
> influence him to help me get and keep some of the Aéropostale
> business. We entered this arrangement without the consent of
> Aeropostale.

16

9/27/12 Tr. 31-32, attached as Exhibit F. The allocution is entirely consistent with Mr. Dey's statements to the SEC and U.S. Attorney.

In sum, Mr. Dey has cooperated with the investigations and has accepted responsibility by pleading guilty to the offense that accurately reflects his conduct.

## V

## The PSR

Doug Dey pleaded guilty on September 27, 2012, more than 13 months ago. After this Court ordered the requisite pre-sentence investigation, he was interviewed by the Probation Officer on October 25, 2012, in the presence of his counsel. At the request of the Probation Officer we subsequently provided financial data by November 15, 2012 and the Fact Submission by the end of January 2013.

The PSR was not issued until July 24, 2013, almost six months after all relevant information had been supplied to the Probation Officer. No reason was provided for the delay. We addressed the numerous deficiencies in the PSR in the Objections, timely filed on August 7, 2013. The government responded by letter on August 21, 2013 ("Gov't Response").

As is clear from the Objections, the PSR is incorrect in a number of serious respects. One of those objections – as to restitution and victim impact – has been cured by the Addendum to the PSR filed on October 21, 2013.

We continue to differ with the government on a number of points raised by the PSR, all of which are addressed by the Objections, the Government Response, the Fact Submission and the Restitution Memo. Of the unresolved issues, however, one merits additional comment: the alleged "Anchor Blue Scheme."

There simply is no evidence to support the government's statement that "there was undoubtedly a scheme whereby Finazzo directed business from Anchor Blue to South Bay *in exchange for undisclosed payments* to him through their jointly-owned entities." Gov't Response, p. 5 (emphasis added). There is no question that South Bay was introduced to Anchor Blue by Chris Finazzo and that Anchor Blue purchased goods from South Bay. However, as Blue's CEO Tom Sands testified, there was "no impropriety from Anchor Blue to South Bay" and Anchor Blue got what it bargained for in its purchases from South Bay. Sands, Tr. 994.

The government's claim that Mr. Dey was involved in a criminal "scheme" with regard to Anchor Blue is without foundation. The fact that South Bay supported the Vertical Line entities (co-owned by Messrs. Dey and Finazzo), in part with funds it legitimately received from Anchor Blue does not establish that South Bay received business from Anchor Blue was "in exchange" for South Bay's using its funds in that way. Significantly, Mr. Dey was never charged with any crime with respect to Anchor Blue. Accordingly we request that the Court not consider the government's claimed "Anchor Blue Scheme" in sentencing Doug Dey.

## VI

### Doug Dey's Future

Doug Dey's future is informed by the catastrophic events following South Bay's termination as a vendor to Aéropostale in 2006. Although he could have immediately closed South Bay and stranded 300 employees, Mr. Dey work hard to keep South Bay alive. In 2009, with its business severely reduced, South Bay had to transfer its then new customers to a successor company, North Fork Apparel. The indictment in June 2010 destroyed that business. Unable to get credit in the wake of the Aéropostale termination of South Bay and his indictment

18

in June 2010, Mr. Dey had to shut down the business of North Fork. The forfeiture allegations in the indictment also resulted in notices of *lis pendens* on the valuable real estate in Calverton, New York that housed the apparel operations.

At the same time, Mr. Dey was engaged in contested divorce proceedings with his wife Jane Maguire Dey. Although ultimately resolved satisfactorily in July 2012, the proceedings severely restrained Mr. Dey's cash flow and assets as well as the operations of his business.

The lengthy delay of the proceedings in this case, both before and after his guilty plea, have weighed heavily on Doug Dey. This was especially true of the long wait for the PSR and sentencing. Unable to begin a new business until recently, Mr. Dey spent his time aiding his parents before his father's death, and his mother thereafter, managing the building he owns at 868 Broadway in Manhattan and selling the Calverton properties to meet the obligations of the Forfeiture Judgment to which he agreed as part of his plea.

Recently, in an effort to rebuild his business and provide a means of support when his sentence has been determined and concluded, Mr. Dey formed a new company called 868 Brands. Although the company is not yet operating, Mr. Dey expects that it will design, manufacture and sell high-end fashion knitwear tops for men and women. Thus, once the uncertainty of his immediate future has been resolved by this Court's sentence, Mr. Dey hopes to find success in the business world once again.

## Conclusion

Doug Dey has admitted his guilt and has accepted responsibility for his actions. Given the circumstances of this case and Mr. Dey's particularly strong personal qualities, we urge this Court to sentence him to no more than a year and a day in custody if the Court

determines custody is required. We request as well that the Court recommend a minimum-security federal prison camp or community correction center and treatment for his medical issues, and that the Court order direct surrender.

Dated: New York, New York
      October 22, 2013

                           Respectfully submitted,

                           CURTIS, MALLET-PREVOST,
                             COLT & MOSLE LLP

By: _____
                           T. Barry Kingham
                           101 Park Avenue
                           New York, New York 10178-0061
                           (212) 696-6000

                           *Attorneys for Defendant Douglas Dey*